### In re PLANNED SYSTEMS, INC., Debtor.

**Bankruptcy No. 2–87–02576.**

United States Bankruptcy Court, S.D. Ohio, E.D.

Sept. 14, 1987.

Thomas C. Scott, Thompson, Hine and Flory, Columbus, Ohio, for Katz Management Group, Inc.

A.C. Strip, Strip, Fargo, Schulman & Hoppers Co., L.P.A., Columbus, Ohio, for Planned Systems, Inc.

### ORDER GRANTING MOTION SEEKING ABANDONMENT AND FOR RELIEF FROM STAY, OR IN THE ALTERNATIVE, FOR ADEQUATE PROTECTION

R.G. COLE, Bankruptcy Judge.

This matter is before the Court upon the motion filed by Katz Management Group, Inc. ("KMG"), seeking relief from stay and abandonment, and the opposing memorandum filed by the debtor, Planned Systems, Inc., (hereinafter referred to as "debtor" or "PSI"). KMG's motion came on for final hearing on August 19, 1987, following which the Court took this matter under advisement.

The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this District. This is a core proceeding which the Court may hear and determine. 28 U.S.C. § 157(b)(2)(G). The following constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule ("B.R.") 7052.

### I. Findings of Fact

The facts in this case are essentially undisputed. On June 11, 1986, PSI, a corporation engaged in the commercial lawn care and landscaping business, filed a petition for relief under Chapter 11 of the Bankruptcy Code. KMG was listed as the holder of both a secured and an unsecured claim against PSI in the Schedules of Assets and Liabilities (Official Form No. 6) ("Schedules") filed by the debtor. In March of 1986, KMG, a corporation involved primarily in the management of commercial real estate, agreed to the sale of the assets of its subsidiary, Lawn Group, Inc. (which conducted the lawn care and landscaping operations for the commercial properties managed by KMG), to PSI. Although a contract to purchase the assets of Lawn Group, Inc., was executed in March of 1986, the actual closing of the sale did not occur until March of 1987. KMG's claims against the debtor arise from this transaction.

Pursuant to the terms of the sale, KMG transferred the assets of Lawn Group, Inc., to PSI for $450,000. A lump-sum cash payment was made by the debtor to KMG, and a promissory note in the amount of $250,000 was taken by KMG. The balance due and owing under the promissory note as of the date of the closing of the sale in March of 1987 was $206,125.25. To secure the payment of the balance due on this

note, a security agreement was executed by and between KMG and PSI. Under the terms of this agreement, KMG took a security interest in all the landscaping and lawn care equipment of Lawn Group, Inc., which consisted of various trucks (including several pick-up trucks, one dump truck and two flat-bed trucks), tractors, mowers, blowers, trimmers, spreaders, edgers and miscellaneous other lawn care/landscaping tools and equipment (hereinafter collectively referred to as the "equipment"). KMG's security interest in the equipment was perfected through the proper filing of financing statements with the Ohio Secretary of State's Office and the Franklin County, Ohio, Recorder's Office on March 12, 1987.

At the hearing of this matter, KMG offered the testimony of Dean Katz ("Katz"), the president and chairman of the board of directors of KMG. Katz testified that Lawn Group, Inc., conducted a detailed examination of the equipment prior to its sale to PSI, and on the basis of this examination a value of $109,000 was assigned to the equipment. Katz, who conceded that he had very little personal involvement in the operations of Lawn Group, Inc., stated that the $109,000 figure was reached by those employees who actually conducted the lawn care operations, including Charlie Hutson ("Hutson"), the head of the lawn care division of KMG. Katz indicated that Hutson and the other employees who participated in the valuation process were generally familiar with the value of lawn care and landscaping equipment, and had purchased and sold such equipment on a regular basis on behalf of Lawn Group, Inc.

In addition, Katz testified that, while the insurance records of Lawn Group, Inc., were utilized in placing a value on the equipment, he had no recollection as to whether standard industry guidelines (such as the "red book" or "green sheets") were consulted in arriving at a valuation figure. Katz noted that, to some extent, the $109,-000 value placed upon the equipment was based upon the "gut feeling" of the employees of Lawn Group, Inc. Katz also stated that liens were held on a dump truck and several tractors by General Motors Acceptance Corporation ("G.M.A.C.") and

Bank One of Ohio, NA ("Bank One"), respectively. Regular monthly payments in the amount of $869 were required to keep the G.M.A.C. and Bank One accounts current.

Katz testified on direct examination that the equipment was purchased between 1981 and 1985. Finally, Katz testified that, in his opinion, the equipment had a total useful life of between three (3) and five (5) years and could be expected to depreciate in value at a rate of approximately 20% per year. No basis for this opinion was provided. Katz provided no opinion as to the value of the equipment as of June 11, 1987 (the date PSI's petition was filed), or of the periodic (*i.e.*, yearly, monthly, weekly, etc.) rate of decline in value of the equipment since the petition date.

The testimony of Chris Davis ("Davis"), who is the president of PSI and the holder of 80% of its stock, was also received. Davis' testimony centered upon the allegation made repeatedly by PSI during the course of the hearing that the equipment sold to PSI by KMG was in a defective state at the time of its delivery in March of 1986. Davis stated that over $60,000 was spent in repairing the equipment in order to place it in workable condition for the 1986 season. Continued expenditures have been made by PSI to keep the equipment operable throughout the 1986 and 1987 seasons.

Davis indicated that the equipment is vital to the day-to-day operations of PSI and, that without such equipment, the debtor could not continue in business. Davis testified that, in his opinion, the equipment had a value of $60,000 as of the hearing date. No basis for this opinion was offered. Davis concluded his testimony by stating that the equipment will steadily decline in value as the landscaping/lawn care season progresses (reaching a low point in November) due to the increased availability of such equipment on the market. It was this seasonal decline in value which explained Davis' opinion that the equipment was worth only $60,000 as of the hearing date (August 19, 1987), despite the fact that such equipment had been valued at

$75,000 approximately two months earlier when the Chapter 11 petition had been filed.

The debtor also presented the testimony of Wayne Miller ("Miller"), the vice-president of PSI, who is currently responsible for managing the operations of the debtor. Miller testified that PSI spends between $2,000 and $4,000 per month in order to keep the equipment in proper operating condition. As to the remaining useful life of the equipment, Miller stated that, in his opinion, if the equipment were properly maintained it would "last for a long time." Miller noted that a downturn in business occasioned by the unusually dry summer resulted in the debtor's financial difficulties. However, Miller also noted that, for the remainder of the year, he expected that PSI's operations would generate a small profit.

On cross examination, Miller testified that, with the exception of the vehicles upon which GMAC and Bank One hold liens, all other equipment subject to KMG's security interest is presently uninsured. With respect to PSI's current obligations, Miller conceded that an arrearage of approximately $2,500–$3,000 existed on the GMAC and Bank One notes and that debtor owes the Internal Revenue Service ("IRS") approximately $200,000 in unpaid taxes.

At the request of the parties, the Court took judicial notice of the case file, including the schedules filed by the debtor and the "operating reports"[1] contained therein, as well as the fact that the debtor has yet to file a plan of reorganization.

At the close of the evidence, KMG argued that it is entitled to relief from stay. KMG asserted that the uncontraverted evidence establishes that PSI possesses no equity in the equipment. Accordingly, under 11 U.S.C. § 362(g), KMG submitted that it had discharged its burden of proof, while debtor had failed to do so. KMG contended that debtor did not show that KMG's interest in the equipment is adequately protected; and, in fact, that debtor had not even made an offer of adequate protection. Accordingly, KMG argued it was entitled to relief from stay under 11 U.S.C. § 362(d)(1).

KMG further argued that § 362(d)(2) requires that the debtor show more than mere indispensability of the equipment to its continued landscape/lawn care operations. In addition, KMG submitted that § 362(d)(2) compels the debtor to establish the reasonable likelihood of an effective reorganization. Because PSI did not introduce credible evidence indicating that a reorganization was reasonably likely, KMG maintained that it is also entitled to relief from stay pursuant to § 362(d)(2). KMG contended that, in view of the $200,000 non-dischargeable debt due the IRS; the $2,500–$3,000 arrearage owing to GMAC and Bank One; the $869 required monthly payments to service these debts; and the, at best, marginally profitable nature of PSI's operations, there is no reasonable likelihood of an effective reorganization in this case. Accordingly, KMG argued that relief from stay is also appropriate under § 362(d)(2) of the Bankruptcy Code.

In response, debtor asserted that KMG had not established that its entitlement to relief from stay under either § 362(d)(1) or (d)(2). Debtor argued that the burden of proof with respect to establishing the value of the equipment as of the petition date, as well as the periodic rate of decline in value of the equipment, rests on KMG as the moving party. From this starting point, PSI posited that because KMG failed to introduce expert testimony establishing

---

**1.** Pursuant to the terms of the Order Regarding Duties of Chapter 11 Debtor–In–Possession entered by this Court on June 29, 1987, PSI was required to file written monthly "operating reports" containing, *inter alia:* a statement of cash receipts and disbursements for the preceding month; a disclosure of all deposits and investments of estate funds; an itemized statement of any compensation and benefits received and expenses incurred by officers, principals, insiders and managers of the debtor-in-possession; a statement of the amounts of all federal, state and local taxes collected, received, withheld or due and the place(s) where such amounts are deposited; a summary of accounts payable and receivable; a statement detailing the basic terms of insurance covering property of the estate; and a narrative summary of significant activities affecting the estate.

valuation as of the petition date and rate of decrease in value, if any, of its secured interest, KMG had not satisfied its burden of proof and, hence, is not entitled to relief from stay. PSI also maintained that by expending over $60,000 to repair and upgrade the equipment since its purchase the debtor has already provided KMG with adequate protection, and, therefore, further post-petition payments were unnecessary. Hence, PSI submitted that KMG is not entitled to relief under § 362(d)(1) of the Bankruptcy Code.

PSI also took the position that KMG should not prevail under 11 U.S.C. § 362(d)(2). Since PSI had shown that it could not continue operations without the equipment, PSI contended that it had conclusively demonstrated that the equipment is necessary to an effective reorganization within the meaning of § 362(d)(2). PSI argued that Miller's testimony that PSI will operate on a profitable basis in the future should be accepted at face value and is sufficient to establish the reasonable likelihood of PSI's reorganization in the future. Accordingly, PSI submitted that KMG is not entitled and should not be granted relief from stay pursuant to either §§ 362(d)(1) or (d)(2) of the Code.

Because issues regarding the burden of proof in stay litigation and the proper standard for relief under § 362(d)(2)(B) are frequently debated in this District, the Court issues the following explanatory opinion.

## II. Discussion

### A. *Introduction*

Immediately upon the filing of a petition for relief under the Bankruptcy Code, an automatic stay arises which generally bars all debt collection activity against the debtor or the property of the bankruptcy estate. 11 U.S.C. § 362(a). The automatic stay imposed by § 362(a) is, of course, one of the fundamental protections accorded a debtor under the Bankruptcy Code. H.R. Rep. No. 95–595, 95th Cong., 1st Sess. 340 (1977), 1978 U.S.Code Cong. & Admin. News, 5787, at 6296. The automatic stay implements two goals: (1) it prevents the diminution or dissipation of the assets of the debtor's estate; and (2) it enables the debtor to avoid the multiplicity of claims against the estate arising in different forums. *See, In re Curtis,* 40 B.R. 795, 798–99 (Bankr.D.Utah 1984); *In re Island Helicopter Corp.,* 63 B.R. 809 (Bankr.E.D. N.Y.1986).[2] Because the automatic stay effectuates these goals and thereby grants the debtor a much-needed "breathing spell" in which to attempt to rehabilitate, the automatic stay has been described as "indispensable to the effective administration of the Chapter 11 reorganization." *In re Island Helicopter Corp.,* 63 B.R. at 814.

■ Congress, cognizant of the potential for harm to secured creditors due to imposition of the automatic stay, established a procedure whereby secured creditors may obtain relief from stay. Under § 362(d), creditors may obtain relief from stay in two instances: (1) where the debtor has no equity in the subject property and such property is not necessary to an effective reorganization [11 U.S.C. § 362(d)(2)]; or (2) where cause exists to grant relief from stay, including lack of adequate protection of a secured creditor's interest in its collateral [11 U.S.C. § 362(d)(1)]. Here, KMG seeks relief from stay under both §§ 362(d)(1) and (d)(2).[3]

### B. *Relief From Stay Under § 362(d)(1)*

In the case *sub judice,* KMG asserted as cause for relief from stay under § 362(d)(1) that its interest in debtor's equipment is not adequately protected. Before under-

---

**2.** *See also, Fidelity Mortgage Investors v. Camelia Builders, Inc.,* 550 F.2d 47, 55 (2d Cir.1976), *cert. denied* 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540 (1977) (automatic stay is intended "to prevent a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts. The stay insures that the debtor's affairs will be centralized, initially, in a single forum in order to prevent conflicting judgments from different courts and in order to harmonize all of the creditors' interests with one another").

**3.** Section 362(d) is worded in the disjunctive; hence, a party seeking relief from stay need establish only one of the two alternative grounds for relief in order to prevail. *In re Rouse,* 43 B.R. 380 (Bankr.E.D.Pa.1984); *In re Pannell,* 12 B.R. 51 (Bankr.E.D.Pa.1981).

taking its adequate protection analysis, the Court must resolve a threshold issue—that is, who bears the burden of proof in this case. The parties disagreed on the question of who bears the burden of proof on the issue of lack of adequate protection. KMG contended that the debtor must affirmatively show that KMG's interest in the equipment is adequately protected. Debtor argued, to the contrary, that KMG's relief from stay motion should not be granted because KMG failed to introduce evidence establishing the value of the equipment as of the petition date and further establishing that the equipment has decreased in value since the filing of PSI's Chapter 11 case. Hence, prior to examining the issue of adequate protection, the proper allocation of the burden of proof (and production of evidence) in stay litigation shall be addressed.

### (1) *Burden of Proof*

Under the Bankruptcy Act of 1898, in order to continue the automatic stay in effect, the debtor was charged with the burden of proving that modification of the

stay would result in prejudice to the administration of the debtor's estate. *See, Foust v. Munson Steamship Lines*, 299 U.S. 77, 83, 57 S.Ct. 90, 93, 81 L.Ed. 49 (1936); *In re Curtis*, 40 B.R. at 801; *In re Kane*, 27 B.R. 902, 905 (Bankr.M.D.Pa.1983). The moving party, however, had the initial burden of showing cause, *i.e.*, why continuance of the stay would cause irreparable damage. *In re the Overmeyer Company, Inc.*, 2 B.C.D. 992, 993 (Bankr.S.D.N.Y.1976).[4] Allocation of the burden of proof in stay litigation under the Act was derived from former Rule of Bankruptcy Procedure 11–44(d).[5]

Under the Bankruptcy Code, the burden of proof in stay litigation is governed by 11 U.S.C. § 362(g), which provides:

(g) In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section—

(1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and

(2) the party opposing such relief has the burden of proof on all other issues.[6]

---

**4.** Professor Frank Kennedy, a leading commentator on the automatic stay under the Act, described the burden of proof in stay litigation as follows:

All the stay rules authorize the court "for cause shown" to terminate, annul, modify, or condition the stay. The rules require a party seeking continuation of any stay against lien enforcement, however, to show that he is entitled to the extension of the protection. It is not easy to reconcile the requirement of a showing of cause for modification of the stay with the requirement of a showing of entitlement for its continuation. It has been suggested that the burden of proof rests on the party seeking continuation of the stay, whether or not lien enforcement is involved. The legislative developments reflected in the amendments of the Bankruptcy Act from 1960 to 1970, however, support the view that the burden of proof as well as the initiative should rest on the party seeking relief from the stay against in personam actions of the kinds mentioned in Rule 401(a).

Kennedy, The Automatic Stay in Bankruptcy, 11 U.Mich.J.L.Ref. 175, 226–27 (1978) (footnotes omitted).

**5.** Former Rule 11–44(d) provided:

Upon the filing of a complaint seeking relief from a stay provided by this rule, the bankruptcy court shall, subject to the provisions of

subdivision (e) of this rule, set the trial for the earliest possible date, and it shall take precedence over all matters except older matters of the same character. The court may, for cause shown, terminate, annul, modify or condition such stay. A party seeking continuation of a stay against lien enforcement shall show that he is entitled thereto.

**6.** Judge Bufford, in his decision in *FSFG Service Corp. v. Kim (In re Kim)*, 71 B.R. 1011 (Bankr.C. D.Cal.1987), aptly noted the policy considerations upon which the rules regarding the allocation of burden of proof in stay litigation are grounded:

This allocation of the burden of proof rests on good policy foundations. The automatic stay is a type of temporary restraining order or preliminary injunction. In fact, it is the broadest and most powerful injunction available from any court in the United States. Unlike a typical temporary restraining order or preliminary injunction, however, it is granted without the showing for a preliminary injunction required in a federal district court or state court, and without a hearing to the parties to be enjoined. The automatic stay is obtained by filing a one-page fill-in-the-blank bankruptcy petition, and paying a ninety dollar filing fee at the clerk's intake window. It is effective even though a creditor may have received no notice whatever of

Although § 362(g) allocates the ultimate burden of proof, it is silent as to the burden of producing evidence. *FSFG Service Corp. v. Kim (In re Kim)*, 71 B.R. 1011, 1015 (Bankr.C.D.Cal.1987) (hereinafter cited as *"In re Kim"* ). The case law establishes that a party seeking relief from stay under § 362(d)(1) is required to establish a *prima facie* case for such relief. *In re Curtis*, 40 B.R. at 802; *In re Setzer*, 47 B.R. 340 (Bankr.E.D.N.Y.1985); *In re Wolsky*, 53 B.R. 751 (Bankr.D.N.D.1985); *In re Kane*, 27 B.R. at 904; *In re Stranahan Gear Co., Inc.*, 67 B.R. 834 (Bankr.E.D.Pa. 1986); *In re Royce*, 32 B.R. 63 (Bankr.M.D. Pa.1983); *In re Playa Development Corp.*, 68 B.R. 549 (Bankr.W.D.Tex.1986); *In re UNR Industries, Inc.*, 54 B.R. 263, 265 (Bankr.N.D.Ill.1985). *Cf. First Nat. Bank of Denver v. Turley*, 705 F.2d 1024 (8th Cir.1983). After the moving party establishes a *prima facie* case, the burden of producing evidence, as well as the ultimate burden of proof *i.e.*, risk of non-persuasion, shifts to the debtor. *In re Kim*, 71 B.R. at 1015. Collier notes that by placing the initial burden of establishing a *prima facie* case on the moving party—*i.e.*, a showing of cause must be made by the party requesting relief under § 362(d)(1)—the practice under the former Act and Rules is, to some extent, followed. 2 *Collier on Bankruptcy* ¶ 362.10, at 362–65 (15th ed. 1986).

■ While Bankruptcy Courts have generally agreed that a party seeking relief under § 362(d)(1) must initially establish a

*prima facie* case, there is some degree of disagreement regarding precisely what this burden of establishing a *prima facie* case entails. Several courts have held that a moving party, in order to make out a *prima facie* case, need only adduce evidence establishing the validity and perfection of its security interest, as well as the amount of the debt and other allowable costs and expenses secured by its claim. *In re Keller*, 45 B.R. 469 (Bankr.N.D.Iowa 1984); *In re Playa Development Corp.*, 68 B.R. at 553; *United Companies Financial Corp. v. Brantley*, 6 B.R. 178, 184 (Bankr.N.D. Fla.1980). Plainly, KMG has made such a showing in the present case. The stipulations entered into between the parties indicate that KMG has a validly-perfected security interest in debtor's equipment and that the balance due under the promissory note executed by the parties is either $193,-000 or $201,000 (the actual amount cannot be finally determined until a dispute regarding claimed, but disputed, credits is resolved).

If the somewhat relaxed *prima facie* case requirements set forth in the above cases were adopted by this Court, the Court would conclude, without further discussion, that KMG has made out a *prima facie* case. The Court believes, however, that such a minimalist approach to the cause requirement of § 362(d)(1) ignores the historical meaning of the phrase "proving a *prima facie* case." [7] Accordingly,

it. . . . The chief benefit to a creditor of lack of notice of the automatic stay is that it provides a defense to a claim under section 362(h) for damages, including punitive damages, and for costs and attorneys fees.

When the automatic stay is challenged by a creditor, however, section 362(g) places most of the burden of proof on a debtor to justify this super-injunction with respect to the challenging creditor, and properly so.

71 B.R. at 1015 (citations omitted).

**7.** The expressions *"prima facie* case" and *"prima facie* evidence" are somewhat ambiguous and have not been consistently defined in the decisional law. 1 D. Louisell & C. Mueller, *Federal Evidence* § 67 at 537 (1977). As originally developed, the phrase *"prima facie* evidence" is such evidence, in judgment of law, as is sufficient to establish the fact; and, if not rebutted, remains sufficient for that purpose. *Kelly v.*

*Jackson*, 6 Pet. 622, 8 L.Ed. 523 (1832); *Bailey v. Alabama*, 219 U.S. 219, 31 S.Ct. 145, 55 L.Ed. 191 (1910); B. Jones *The Law of Evidence in Civil Cases* § 8 at 10 (4th ed. 1938). Application of this historical definition to the relief from stay context leads to the ineluctable conclusion that a party seeking relief from stay must do more than simply establish a validly perfected secured interest and the amount of the debt owed. Such proof, standing alone, would not be sufficient to establish that cause exists under § 362(d)(1), such as lack of adequate protection, entitling the movant to relief from stay. Accordingly, some evidence of cause, such as facts evincing a lack of adequate protection (*e.g.,* a decrease in the value of the collateral, lack of proper maintenance of the collateral, non-payment of taxes, lack of insurance coverage for the collateral, *etc.*) must be produced by the moving party if the *prima facie* case requirement is to be satisfied.

the Court holds that a party seeking relief under § 362(d)(1), in order to make out a *prima facie* case, must do more than merely prove that it holds a validly-perfected security interest and establish the amount of the debt and other allowable costs secured by its claim. In order to make a *prima facie* case under § 362(d)(1), and thereby shift the burden of proving that the secured creditor's interest is adequately protected to the debtor, the movant must establish a legally sufficient basis, *i.e.*, cause, for relief. *In re Kane*, 27 B.R. at 905; *In re Stranahan Gear Co., Inc.*, 67 B.R. at 837; *In re Curtis*, 40 B.R. at 802–03.

The policy foundations underlying the rule that a party seeking relief under § 362(d)(1) bears the burden of producing evidence establishing a legally sufficient basis for such relief are clear. It would be both illogical and inefficient to require the debtor to demonstrate the nonexistence of every conceivable cause for relief under § 362(d)(1). *In re Setzer*, 47 B.R. at 345. Practical considerations also underly the allocation of the initial burden of production to the movant. As Professor Kennedy has noted, "facts providing a justification for modifying the stay will ordinarily be more easily provable by the creditor than disprovable by the [debtor]." Kennedy, *The Automatic Stay in Bankruptcy*, 11 U.Mich.J.L.Ref. 175, 227 (1978). Further, if the burden of producing evidence were not initially allocated to the party seeking relief under § 362(d)(1), debtors would encounter difficult, if not insurmountable, problems of proof. As the *In re Kim* court noted:

> Absent the requirement that a creditor establish a prima facie case to qualify for relief from stay, relief from stay motions would be reduced to one-liners: By simply stating, "I move for relief from stay," a creditor would be able to put a debtor to his or her proof on entitlement to an automatic stay and the provision of adequate protection.

71 B.R. at 1016.[8]

In sum, sound policy considerations militate in favor of a rule requiring that the party seeking relief from stay under § 362(d)(1) introduce a certain quantum of evidence sufficient to establish a *prima facie* case, or cause, thereby putting the debtor to the burden of producing evidence to show that the movant's interest is adequately protected. Unless the quantum of proof on the issue of cause under § 362(d)(1) reaches a certain threshold, no *prima facie* case is established and the debtor is not required to introduce evidence to meet and rebut the *prima facie* case. *In re Kim*, 71 B.R. at 1016. Whether the evidence presented by KMG rises to the threshold level of a *prima facie* case, or cause, will be considered below.

### (2) *Application To This Proceeding*

What constitutes a *prima facie* case for relief from stay turns on the grounds upon which relief from stay is sought. Where, as here, cause for relief from stay is grounded upon an alleged decline in value of the creditor's collateral along with a failure by the debtor to offset such decline by periodic cash payments or some other form of adequate protection, the movant must establish a *prima facie* case supporting this asserted cause for relief from the automatic stay. *In re Kim*, 71 B.R. at 1016. Such a *prima facie* case may include: (1) a showing of an obligation owing by the debtor to the creditor; (2) a valid security interest as to which relief from stay is sought; and (3) the cause justifying relief from stay, in this case a decrease in the value of the equipment securing debtor's obligation to the movant combined with the failure on the part of the debtor to provide adequate protection of the movant's interest in the equipment. As previously noted, KMG has established two of the three elements of a *prima facie* case enumerated above. Accordingly, whether

---

**8.** As Judge Bufford noted in *In re Kim*, 71 B.R. at 1011, the rule requiring that a party seeking relief under § 362(d)(1) bear the initial burden of production is based upon the premise that the burden of producing evidence should "normally be allocated to the party most likely to have the evidence and the motivation to produce it." *Id.* at 1016.

KMG is entitled to relief from stay turns upon whether, on the record made at hearing, KMG has established a *prima facie* case of lack of adequate protection.

The Bankruptcy Code does not expressly define the term "adequate protection" contained in § 362(d)(1). Three non-exclusive examples of adequate protection are set forth in 11 U.S.C. § 361. That section states as follows:

§ 361. Adequate protection.

When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—

(1) requiring the trustee to make periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

The concept of adequate protection is derived from the fifth amendment protection of property interests. *See, Wright v. Union Central Life Ins. Co.,* 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940); *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935). The principle of adequate protection reconciles the competing interests of the debtor, who needs time to reorganize free from harassing creditors, and the secured creditor, on the other hand, who is entitled to constitutional protection for its bargained-for property interest. *See,* H.R. Rep. No. 95–595, 95th Cong., 1st Sess. (1977), 1978 U.S.Code Cong. & Admin. News, p. 5787. *In re Jug End In The Berkshires, Inc.,* 46 B.R. 892 (Bankr.D. Mass.1985). Although the notion of adequate protection is derived from constitutional grounds, it also encompasses sound policy considerations. Secured creditors should not be deprived of the benefit of their bargain. *Id.* at 899; *In re Winslow Center Associates,* 32 B.R. 685, 688 (Bankr.E.D.Pa.1983). Thus, by providing the creditor with a means of protection for its interest, adequate protection permits the debtor to continue his reorganization free from the harshness of a relief from stay. *In re Jug End In The Berkshires, Inc.,* 46 B.R. at 899.

In the relief from stay context, adequate protection includes protecting the secured creditor from any decrease in the value of the secured creditor's interest in the collateral caused by the imposition of the automatic stay.[9] With respect to the

**9.** The measure of any decrease in the secured creditor's interest in property depends upon what is meant by the "value" of an "interest in property." *See, In re South Village, Inc.,* 25 B.R. 987, 989 (Bankr.D.Utah 1982); *In re Alyucan Interstate Corp.,* 12 B.R. 803, 806–809 (Bankr.D. Utah 1981). If the interest in the secured creditor's property is determined according to the worth of tangible assets, such as the "allowed secured claim" [as defined in 11 U.S.C. § 506(a)], then the decrease in value may be any depreciation of this claim. However, if the interest in property includes not only tangible assets but also intangible interests, such as the right to foreclose, liquidate and reinvest, then the decrease in value may also embrace such so-called "lost opportunity costs." *In re South Village, Inc.,* 25 B.R. at 989. Whether adequate protection requires compensation for lost opportunity costs is a question which has spawned great debate among bankruptcy courts and has created a split in the case law emanating from the Circuit Courts. *Compare, In re American Mariner Industries, Inc.,* 734 F.2d 426 (9th Cir. 1984) and *Grundy Nat. Bank v. Tandem Min. Corp.,* 754 F.2d 1436 (4th Cir.1985) with *In re Timbers of Inwood Forest Associates, Ltd.,* 808 F.2d 363 (5th Cir.1987), *cert. granted,* — U.S. ——, 107 S.Ct. 2459, 95 L.Ed.2d 868 (1987). Because KMG has not argued that adequate protection payments should include lost opportunity costs, the Court need not address the question of the recoverability of lost opportunity costs as a component of adequate protection in this case.

automatic stay, "Congress believed the existence *vel non* of such a decline [in the secured creditor's collateral] to be almost decisive in determining the need for adequate protection." *In re Saypol*, 31 B.R. 796, 800 (Bankr.S.D.N.Y.1983). Accordingly, KMG may make out a *prima facie* case, or cause, for relief under § 362(d)(1), if it can establish that debtor has not provided KMG with compensation for any decrease in value of the equipment, since the petition date, which is attributable to the stay.

■ While KMG repeatedly pointed out that the debtor possesses no equity in the equipment, the Court notes that it is proof of a post-petition decline in value of the equipment, caused by the imposition of the automatic stay, as opposed to a mere lack of equity in the equipment, which would support a finding of lack of adequate protection. This Court believes that the existence or non-existence of equity [10] should not be the *sine qua non* for adequate protection. As the court in *In re Smithfield Estates, Inc.*, 48 B.R. 910 (Bankr.D.R. I.1985), observed:

> The weight of authority and in our view the better reasoned opinions, hold that adequate protection relates to maintaining the status-quo during the period after the filing of the petition and before confirmation or rejection of the plan. The secured creditor is entitled to protection against any depreciation or diminution in the value of the collateral as it

existed and was available to satisfy the debt on the date of the filing of the petition in bankruptcy.

> While an equity cushion [11] is generally considered prima facie evidence of adequate protection, the absence of an equity cushion does not establish the converse, *i.e.*, that as a matter of law the creditor is not adequately protected. For example, a creditor who is undersecured on the date of filing is not entitled to relief from stay merely by showing that there is no equity in the property. An (under)secured creditor's position is not worse immediately after the filing than it was just prior thereto, and the provisions for adequate protection may only protect the secured creditor from any impairment in the value of its interest that is *attributable to the stay*. The concept of adequate protection was not designed or intended to place an undersecured or minimally secured creditor in a better post-filing petition than it was in before the stay.

48 B.R. at 914–15 (citations and footnotes omitted) (emphasis in original).

Thus, KMG's demonstration of the mere non-existence of equity is not sufficient to establish a *prima facie* case of lack of adequate protection under § 362(d)(1). If KMG is to make out a *prima facie* case for lifting the stay, it must show that the value of its collateral, and, thus, the value of its lien,[12] is diminishing. "Once the likelihood

---

**10.** Equity has been defined by bankruptcy courts as the difference between the property value and the total amount of liens against it. *See, e.g., In re Jug End In The Berkshires*, 46 B.R. at 901; *In re Mellor*, 734 F.2d 1396, 1400 n. 2 (9th Cir.1984); *In re Faires*, 34 B.R. 549, 551 (Bankr.W.D.Wash.1983); *In re Shriver*, 33 B.R. 176, 186–87 (Bankr.N.D.Ohio 1983); *In re St. Peter's School*, 16 B.R. 404, 408 (Bankr.S.D.N.Y. 1982); *In re Dallasta*, 7 B.R. 883, 885 (Bankr.E. D.Pa.1980); *La Jolla Mortgage Fund v. Rancho El Cajon Associates*, 18 B.R. 283 (Bankr.S.D.Cal. 1982).

**11.** An equity cushion is the value in the property above the amount owed to the creditor with a secured claim that will protect that creditor's secured interest from decreasing in value during the period that the automatic stay remains in effect. *In re Jug End In The Berkshires*, 46 B.R. at 899; *In re Roane*, 8 B.R. 997, 1000

(Bankr.E.D.Pa.1981), *aff'd.* 14 B.R. 542 (E.D.Pa. 1981). It has been held that an equity cushion, standing alone, can provide adequate protection. *In re San Clemente Estates*, 5 B.R. 605, 610 (Bankr.S.D.Cal.1980); *In re Tucker*, 5 B.R. 180, 182 (Bankr.S.D.N.Y.1980).

**12.** The term "lien" is used above as a shorthand expression for the movant's allowed secured claim under 11 U.S.C. § 506(a). As defined in § 506(a), if the creditor has a lien against property and if he is oversecured, the allowed secured claim is the amount of the debt. If the creditor is undersecured, as in the case at bar, it is the value of the collateral. Hence, § 506(a) contemplates the division of claims into secured and unsecured portions on the basis of the worth of the collateral. *See, In re South Village, Inc.*, 25 B.R. at 989; *In re Alyucan Interstate Corp.*, 12 B.R. at 808 n. 10.

of a diminution in value has been credibly raised, a prima facie case for lifting the stay for lack of adequate protection has been made until and unless [the debtor] effectively negate[s] this showing by competent evidence." *In re Greiman,* 45 B.R. 574, 582 (Bankr.N.D.Iowa 1984). *See also, In re Borchers,* 45 B.R. 69, 72 (Bankr.N.D. Iowa 1984).

■ Applying the foregoing principles to the case at bar, the Court finds that KMG has established a *prima facie* case of lack of adequate protection. The testimony elicited from Davis indicated that the equipment has diminished in value by $15,000 since the date debtor's Chapter 11 petition was filed. Davis further testified that the equipment is decreasing in value at the present time; will continue to do so as the lawn care/landscaping season progresses; and will reach a low point sometime around November of 1987. Having produced credible evidence of the diminution in value of the equipment securing debtor's obligation to KMG, movant has established a *prima facie* case, or cause, pursuant to § 362(d)(1).[13] Thus, the burden of proving that KMG's interest in the equipment is adequately protected is shifted to the debtor.

■ On the record made at hearing, the Court is compelled to conclude that the debtor has not proven that KMG's interest in the equipment is adequately protected. PSI has not shown that it has, or will, compensate KMG for the $15,000 decline in value, which its own witness, Davis, testified that the equipment has suffered since the petition date. No method of providing compensation for, or protection against, the future decrease in value of the equipment (which Davis testified would inevitably occur between the date of hearing and November) was proposed by the debtor. In fact, the only offer of adequate protection made by debtor consisted of its proposal to continue to maintain the equipment, to make the regular monthly payments due GMAC and Bank One and to make some "nominal" (no precise figure was offered) payments to KMG. This proposal obviously does not contemplate any form of compensation to KMG for the diminution in value of its collateral, both past and prospective.[14] In addition, the uncontraverted evidence adduced by KMG also established that, with a few exceptions, most of the equipment is completely uninsured. This further compels the conclusion that debtor has failed to adequately protect KMG's interest in the collateral.

■ Instead of presenting a meaningful proposal for adequate protection, the debtor argues that it has already provided KMG with adequate protection by expending over $60,000 to repair the equipment in the time period between debtor's taking possession of the equipment in March of 1986 and the petition date (June 11, 1986). This contention is totally meritless. Indeed, its assertion evidences a fundamental misunderstanding of the concept of adequate protection. As described above, adequate protection is designed to preserve the secured creditor's position at the time of the bankruptcy during the pendency of the automatic stay. Plainly, the fact that PSI may have enhanced the value of KMG's collateral by making repairs to the equipment on a pre-petition basis is of no consequence to the Court's determination

---

**13.** While the Court finds that KMG has established a *prima facie* case of lack of adequate protection under § 362(d)(1), it clearly did so by only a narrow margin. But for the admission regarding the equipment's decline in value obtained from Davis, the Court would not have found that a *prima facie* case had been made out by the movant. The Court finds the testimony of Katz regarding the value of the equipment and its useful life to be of virtually no probative value. Katz conceded that he had no appraisal training and that he had very little involvement in the operations of Lawn Group, Inc., prior to its sale to PSI. Furthermore, Katz agreed that

his opinion as to valuation could be described, in part, as a "gut feeling." Obviously, the movant and the Court would have benefited from the introduction of expert appraisal, or more probative opinion, testimony establishing the value of the secured property as of the date PSI's Chapter 11 petition was filed as well as its projected periodic decline in value in the future.

**14.** As noted above, Davis testified that the equipment had decreased in value by $15,000 since the petition date and will continue to decline in value in an unspecified amount until November.

of whether KMG's collateral has been, or will be, adequately protected from the date of the petition's filing forward to the date of confirmation or rejection of debtor's plan.[15] Accordingly, the Court holds that the debtor has failed to prove that KMG's interest in the equipment is adequately protected and, therefore, the Court finds that KMG is entitled to relief from stay pursuant to § 362(d)(1).

### C. Relief From Stay Under § 362(d)(2)

KMG is also entitled to relief from stay under § 362(d)(2). 11 U.S.C. § 362(d)(2) provides that a bankruptcy court shall grant relief from the automatic stay:

> with respect to a stay of an act against property ... if—
>
> (A) the debtor does not have equity in such property; and
>
> (B) such property is not necessary to an effective reorganization."

As already noted, the Court finds that KMG has satisfied its burden of proving that the debtor lacks equity in the equipment. Thus, the Court will turn to the issue of whether PSI's lawn care/landscaping equipment is necessary to an effective reorganization.

#### (1) Property Necessary For An Effective Reorganization

Two divergent lines of authority have emerged from the cases interpreting the meaning of the phrase "necessary to an effective reorganization." The minority view is often referred to as the "necessity test" and is detailed in the opinion of Judge Mabey in *Empire Enterprises, Inc. v. Leo W. Koopmans (In re Koopmans)*, 22 B.R. 395 (Bankr.D.Utah 1982) (hereinafter cited as *"Koopmans"*). After exploring in detail the language and the legislative history of § 362(d)(2)(B), the *Koopmans* opinion concluded that this subsection does not require a showing that reorganization of the debtor's operations is feasible in order to continue the stay in effect. The *Koopmans* court's rejection of the "feasibility test" was predicated upon its interpretation of the language of § 362(d)(2)(B) as well as practical considerations. It specifically noted that "effective" modifies the word "reorganization", "which embraces rehabilitation and liquidation." 22 B.R. at 398. The *Koopmans* opinion further states:

> "[I]ndeed, now that reorganization may mean liquidation, necessity cannot be tied to rehabilitation alone. In light of this distinction, and the new scope for reorganization, it is improbable that the necessity language creates a rehabilitation test in subpart (2)(B)."

22 B.R. at 398 (footnotes omitted).

Noting that feasibility determinations were generally inpractical,[16] as well as the particular difficulty of applying a feasibility test in the context of a relief from

---

**15.** The Court also finds that the allegations regarding the defective nature of the lawn care/landscaping equipment which was delivered to the Debtor in March of 1986 by KMG also have no bearing upon the instant motion. While such allegations, if meritorious, may give rise to a breach of contract or breach of warranty claim, such a claim is properly asserted by way of adversary proceeding, not in the context of a relief from stay motion.

**16.** As to the practical difficulties engendered by application of the feasibility test, *Koopmans* states:

> A further reason for rejecting a rehabilitation test in Section 362(d)(2)(B) is that such a test is impracticable. When a debtor files a petition, he is on the verge of collapse. He may have suffered losses for months. Creditors are foreclosing. Financial aid is a mirage. The forecast required under the rehabilitation test extrapolates from the past. But

does the past of any debtor suggest a propitious future? Thus the rule, *circulum in probando,* becomes a self-fulfilling prophecy.

The debtor needs an overhaul using the tools of reorganization. He files because executory contracts may be rejected. Liens may be avoided. Property may be sold. Liabilities may be reduced or the terms of payment altered. If mismanagement is the cause of failure, a trustee may be appointed. Meanwhile, debtor, the trustee, creditor committees, and other parties in interest are bargaining toward a plan. These activities and the times set for their accomplishment are at odds with the rehabilitation test. No one knows whether the debtor can survive until he has done what Chapter 11 affords him occasion to do: clean house and work out a plan.

22 B.R. at 404 n. 17.

stay hearing,[17] the *Koopmans* court concluded that a "necessity test" should be utilized in lieu of a feasibility test in applying § 362(d)(2)(B). The *Koopmans* opinion articulated the criteria for the necessity test as follows:

> "... property in which the Debtor has no equity is necessary to an effective reorganization whenever it is necessary, either in the operation of the business or in a plan, to further the interest of the estate through rehabilitation or liquidation." [18]

*Id.* at 407.

Under the necessity test enunciated in *Koopmans,* the secured property, even without equity, could be found useful in the liquidation of other properties; or when sold in a package with other assets; or it could well be sold for the direct benefit of junior lienors and the indirect benefit of unsecured creditors. *In re Playa Development Corp.,* 68 B.R. at 554. A number of courts have followed the line of reasoning set forth in *Koopmans. See, e.g., In re W.S. Sheppley & Co.,* 45 B.R. 473 (Bankr. N.D.Iowa 1984); *In re Greiman,* 45 B.R. at 580; *In re Faires,* 34 B.R. at 552–53; *In re Lilyerd,* 49 B.R. 109 (Bankr.D.Minn. 1985).

■ The majority of courts which have considered the issue have held that the

reference to an "effective" reorganization in § 362(d)(2)(B) requires that relief from stay be granted if there is no reasonable likelihood of reorganization due to creditor dissent or feasibility considerations. *See, e.g., In re Timbers of Inwood Forrest Associates, Ltd.,* 808 F.2d at 370–71; *In re Grundy Nat. Bank v. Tandem Min. Corp.,* 754 F.2d at 1440; *In re Ahlers,* 794 F.2d 388, 397–98 (8th Cir.1986), *cert. granted,* —— U.S. ——, 107 S.Ct. 3227, 97 L.Ed.2d 733 (1987); *In re Albany Partners, Ltd.,* 749 F.2d 670, 673 n. 7 (11th Cir.1984); *In re Cablehouse, Ltd.,* 68 B.R. 309 (Bankr.S.D. Ohio 1986) (per Perlman, C.J.); *In re 6200 Ridge, Inc.,* 69 B.R. 837 (Bankr.E.D.Pa. 1987); *In re Jug End In The Berkshires, Inc.,* 46 B.R. at 902; *In re Bellina's Restaurants II, Inc.,* 52 B.R. 509, 512 (Bankr. S.D.Fla.1985); *In re Island Helicopter Corp.,* 63 B.R. 809, 814 (Bankr.E.D.N.Y. 1986); *In re Playa Development Corp.,* 68 B.R. at 553–54. The leading case, in which the feasibility test was first postulated, *In the Matter of Terra Mar Associates,* 3 B.R. 462, 466 (Bankr.D.Conn.1980), held that § 362(d)(2) required a showing "that there is a reasonable possibility of a successful reorganization within a reasonable time."

Upon consideration of the foregoing authorities, this Court is inclined to follow the majority view and hereby adopts the feasibility test. The Court believes that the

---

**17.** Judge Mabey noted that the feasibility test is more appropriately applied in the context of a motion to dismiss under 11 U.S.C. § 1112(b) than in the relief from stay setting:

> For these reasons, relief from stay hearings are held upon request, usually by a single creditor, often early in a case. The hearings are expedited and may be informal. The debtor has the burden of proof on all questions except for the existence of equity. The issues are confined to the creditor and his collateral; thus, notice to all parties in interest is unnecessary.... Resolution must be swift.
>
> Motions to dismiss, on the other hand, may be brought by any party. The hearings need not be accelerated and may be formal. The movant has the burden of proof. The issues are broad, involving the future of the estate, thus, notice to all or representative parties in interest is necesary. The presentation of views should be many-sided. Indeed, the trustee or creditor committees may investigate the business as a prelude to the hearing.

> Time and preparation commensurate with the relief sought are expected.
>
> In short, the rehabilitation test must be applied with discretion, not compulsion. It is amenable to ultimate, complex issues such as dismissal, but not to interim, abbreviated contests over the stay. It is workable given the procedures of Section 1112(b)(1), but not of Section 362(d)(2)(B).

22 B.R. at 401 (footnotes omitted).

**18.** This Court concurs with the conclusion reached by the *Koopmans* court that, because a plan of reorganization under Chapter 11 can include a liquidating plan, there may be circumstances under which the debtor is able to satisfy the effective reorganization test of § 362(d)(2) by showing that the property in question is necessary to an effective liquidation of the debtor under Chapter 11 as opposed to an effective rehabilitation of the debtor. However, because PSI did not assert that it intends to file a liquidating plan, this distinction is of no moment in the present case.

narrow "necessity test" fails to give meaning to the phrase "effective reorganization" contained in § 362(d)(2)(B). *In re Jug End In The Berkshires, Inc.*, 46 B.R. at 902; *In re Playa Development Corp.*, 68 B.R. at 555; *In re Clark Technical Associates, Ltd.*, 9 B.R. 738, 740 (Bankr.D.Conn. 1981). Accordingly, if the debtor is to meet its burden of proving that the property is necessary for an effective reorganization, it must show the existence of a reasonable possibility that a successful rehabilitation or a successful liquidation can be accomplished within a reasonable period of time and that the property in question will contribute to this effect.

While the Court holds that a correct reading of § 362(d)(2)(B) requires application of the feasibility test, the Court believes that this test should be delicately applied so as not to prematurely sound the death knell to a debtor's rehabilitative efforts. Clearly, courts should not scuttle property vital to a debtor's reorganization until the debtor has had a full opportunity to utilize the rehabilitative tools afforded by the Bankruptcy Code. At the same time, however, the "effective reorganization" language of § 362(d)(2)(B) obliges the debtor to make some showing that a reorganization is possible. These conflicting interests can be accommodated by a rule that resolves uncertainties in favor of the debtor during the period in which debtor is granted the exclusive right to file a plan of reorganization. *See e.g., In re 6200 Ridge, Inc.*, 69 B.R. at 843; *Dore & Associates Contracting, Inc. v. American Druggists' Insurance Co.*, 54 B.R. 353, 359 (Bankr.W. D.Wisc.1985). As the Fifth Circuit noted in *In re Timbers of Inwood Forrest Associates, Ltd.*, a bankruptcy court should apply the "reasonable possibility of successful reorganization" standard with "somewhat more indulgence than would be appropriate if the motion were made at a later stage in the proceedings or if a similar issue were raised in the context of the full-blown hearing that attends a motion to dismiss or convert the case brought under § 1112." 808 F.2d at 371.

In sum, the Court holds that where, as here, a reorganization is in its infancy, a somewhat relaxed standard of proof will be imposed upon the debtor. Nevertheless, the debtor must do more than merely evince high hopes. As one court has stated:

> The debtor need not show that it has actually proposed a plan which is acceptable to its creditors.... The debtor need only demonstrate a reasonable probability that it will be able to propose a plan for a successful reorganization within a reasonable time.... A reasonable probability cannot be grounded solely on speculation, however, and a "mere financial pipe dream" is insufficient to meet the requirements of § 362(d)(2). *In re Dublin Properties*, 12 B.R. 77, 81 (Bankr.E.D.Pa.1981).

*In re Jug End In The Berkshires, Inc.*, 46 B.R. at 902 (footnotes and some citations omitted). In view of the principles discussed above, the Court holds that, in order to satisfy its burden of proof, at a minimum, the Debtor must provide the Court with a broad outline of how it intends to employ the rehabilitative mechanisms of the Code to effectuate a reorganization within a reasonable time period. While the Debtor need not show that it has proposed a plan which will be deemed acceptable by its creditors, it must demonstrate a reasonable probability that it will be able to propose a plan for a successful reorganization within a reasonable time.

#### (2) *Application To This Proceeding*

Bearing in mind the fact that the feasibility test should be applied with some degree of liberality in the early stages of this Chapter 11 proceeding,[19] the Court,

---

19. While the debtor should be granted a meaningful opportunity to reorganize, the Court does not suggest that time alone is a palliative of a financially distressed corporation's woes. Nor does the Court imply that an extended time period is normally required to effect a reorganization under Chapter 11 of the Bankruptcy Code. As the Fifth Circuit recently noted:

> In the case of most Chapter 11 debtors, however, a plan of reorganization can be effectuated, if at all, within a matter of months not years. An occasional Chapter 11 debtor,

nonetheless, is compelled to conclude that Debtor has not demonstrated a reasonable prospect for a successful reorganization within a reasonable time. Although this Court is reluctant to abort Debtor's nascent reorganization, it is compelled to do so given the record made by the parties at hearing. The Debtor put on no evidence to provide the Court with even the barest outline of a possible plan of reorganization. The Debtor presented no evidence that it intended to attempt to find a buyer for the business or obtain new sources of capital. No evidence was offered to show that the Debtor would obtain new or additional contracts. Further, no income or profit projection or quantitative financial forecast of any kind was introduced by the Debtor.

The only evidence presented by Debtor which remotely suggested that a reorganization was possible was Miller's testimony that he expected PSI to be profitable in the future. However, this naked assertion amounts to little more than the financial pipe dream referred to by the court in *In re Dublin Properties* [12 B.R. at 81]. Such testimony, being grounded solely on speculation, has uniformly been held to be insufficient to meet the requirements of § 362(d)(2). *See, e.g., In re Mikole Developers, Inc.,* 14 B.R. 524 (Bankr.E.D.Pa. 1981) ("debtor's high hopes for reorganization or need alone for the property is not the *sine qua non* under § 362(d)(2)(B)"); [20] *In re Kors, Inc.,* 11 B.R. 324 (Bankr.D.Vt. 1981) (property not necessary "[i]f all the debtor can offer at this time is high hopes without any financial prospects on the horizon to warrant a conclusion that a reorganization in the near future is likely"). In short, Debtor has failed to produce any credible evidence that there is a reasonable possibility of a successful reorganization

for example, one with a complex debt structure or multifarious business problems, may require more time. However, the existence of such a debtor is the exception, not the rule. *In re Timbers of Inwood Forrest Associates, Ltd.,* 808 F.2d at 372.

**20.** Debtor argued that it had made the required showing under § 362(d)(2)(B) because it had established that without the equipment PSI's operations could not continue. However, the Court concurs with the holding of the Court in

within a reasonable time. Hence, Debtor has not sustained its burden of proof and, therefore, KMG is also entitled to relief from stay under § 362(d)(2)(B).

### III. Conclusion

Based upon the foregoing, the Court finds that KMG's interest in the equipment lacks adequate protection and, thus, cause exists under § 362(d)(1) to order relief from stay. The Court further finds that there is no equity in the equipment and such equipment is not necessary to an effective reorganization within the meaning of § 362(d)(2)(B). Hence, relief from stay is also appropriate pursuant to § 362(d)(2). Accordingly, the Motion Seeking Abandonent and For Relief From Stay, or In The Alternative, For Adequate Protection of Katz Management Group, Inc., shall be, and the same hereby is, GRANTED.

IT IS SO ORDERED.

*In re Mikole Developers, Inc.,* [14 B.R. 524] that, under the feasibility test, need alone is not controlling. As Professor Kennedy has noted:

"Indispensability of the property to the debtor's survival and hope of rehabilitation is not enough, of course, to justify continuation of the stay where rehabilitation is hopeless or the stay threatens injury to the lienor's security."

Kennedy, *The Automatic Stay in Bankruptcy* 11 U.Mich.L.J.Ref. 175, 244 (1978).